We'll hear argument this morning in Case 23-124, Harrington v. Purdue Pharma. Mr. Gannon. Mr. Chief Justice, and may it please the Court. The Court of Appeals approved a Chapter 11 reorganization plan that will release claims that Purdue Pharma's creditors have against other non-debtors, principally the Sackler family members, who took billions of dollars from Purdue in the years before Purdue's bankruptcy, but have not filed for bankruptcy protection themselves, and have made only a portion of their assets available to the estate in Purdue's bankruptcy. The Court of Appeals found authority for that release in a catch-all provision of Chapter 11. Section 1123b-6 says a plan may include any other appropriate provision not inconsistent with the applicable provisions of this title. But this release goes beyond what the statute authorizes, as construed in its context, and it also conflicts with the basic nuts and bolts of the Bankruptcy Code's comprehensive scheme. It permits the Sacklers to decide how much they're going to contribute. It grants the Sacklers the functional equivalent of a discharge. What they might get if they themselves were in bankruptcy, though even such a discharge would not extend as this one does, to claims involving fraud and willful misconduct. And even though Section 524e expressly provides that the discharge of a debtor does not affect the liability of any other entity, this release extinguishes personal property rights, the creditor's state law-chosen section, that do not belong to the bankruptcy estate. That result is not supported by any historical analog. Inequity, and it raises significant constitutional questions that should be avoided in the absence of a clear command from Congress. This Court should hold that nonconsensual third-party releases are not authorized by the Bankruptcy Code. I welcome the Court's questions. Mr. Garr, under your reading of these provisions of the Bankruptcy Code, are consensual agreements or releases acceptable? We do think consensual releases are acceptable. What's the difference? On what provision in the Code do you rely for that? We don't think there needs to be authority in the Code for that, because the authority for the release is coming from the parties' agreement. There's no need to use a bankruptcy power to forcibly resolve claims that don't actually belong to the estate or seek estate property, and there wouldn't be a need for an injunction at that point. So you're saying that the mere fact that they consent gives the Bankruptcy Court authority? No. Well, we are saying the Bankruptcy Court can acknowledge the parties' agreement, but whether that goes in the plan I think is an administrative question there. The force of the release is coming from the parties' agreement. Conceptually, though, what's the difference between a consensual and a nonconsensual release? Conceptually, the difference is that the party is surrendering its property right with its consent, and therefore it doesn't present the same problems that we have with a nonconsensual release. Well, I can see that from a due process standpoint, but from the standpoint of the Bankruptcy Court resolving that, I don't see what the difference is. Well, the difference is that, as I said at the beginning of this answer, you don't need the forcible authority of the Bankruptcy Code or the Bankruptcy Court to extinguish the property right there. It's been extinguished by virtue of the agreement of the parties. And so if the parties have agreed that this is the terms of the agreement, the plan may be contingent upon that side agreement, but that doesn't mean that the Bankruptcy Court needs to give it imprimatur to that agreement in order for it to be enforceable. It's already separately enforceable. Well, finally, under B-6, B-6 seems pretty broad. How would you narrow that to reach your conclusion? Well, we think that you should consider it in context, and we think it's important that the enumerated provisions at the beginning of B are all limited to what this Court has repeatedly said the Bankruptcy Code is about, which is the relationship between creditors and debtors. If you look at the enumerated provisions, B-2 talks about Assumption, Rejection, and Assignment of Executory Contracts and Leases of the Debtor. B-3a, which is particularly important here, talks about the Settlement of Claims or Interests Belonging to the Debtor or to the Estate. B-4 talks about Sale of Property of the Estate. And so in context, we think that it makes sense that if you can settle claims of the estate, it doesn't mean that you can settle claims that are not of the estate. And we point out that this is inconsistent with many other provisions in the Code. It's inconsistent with the scope of a discharge, with respect to who can get the discharge and what can be discharged. We cite multiple provisions that get to that. It's inconsistent with the idea that the debtor is supposed to be contributing all of its assets with a handful of exemptions to be property of the estate, and that's not what the Sacklers are doing here. Your Honor, Counsel, the argument that you just described, which was the same one you began with, which is you have a series of provisions focused on particular issues that arise in the context of bankruptcy, and then you have a general catch-all talking about appropriate provisions, not inconsistent. It seems to me that that's a fairly clear case for the application of what is called our Major Questions Doctrine. In other words, whether or not the bankruptcy court can reach beyond the bankruptcy to bind people who are neither creditors nor debtors in the bankruptcy, on the basis of not only its B-6 after 1 through 5 are fairly focused, and this one's sort of a general catch-all, which others are trying to seek broad authority. Is there a reason you didn't cite any of those precedents? Well, we don't think that you need to look at any of those terms. If you look at Krzyzewski, the court just used regular principles of statutory construction. It did cite the principle that we don't think that Congress hides elephants in mouse holes, and so to the extent that your impulse is getting at that issue, we tend to agree with it. We think that this is a catch-all provision. It needs to be construed in context, and we think that this is more inconsistent with other provisions in the Code than the adventures that the court disapproved in cases like Krzyzewski and Radlax. Should we address, in your view, is that appropriate to address that issue in the context of the precedents? Or is it appropriate for you to challenge your adversary's position on that basis? Well, I'm not going to deny that this is a big deal for bankruptcy, but the reason we think that we win is because this departs from the Bankruptcy Code, not because we think that it's of such inherent significance that only Congress needs to be the one to address it. We think that if Congress had a catch-all provision that were broad enough to permit something like this, that may be okay. We don't think we need that in this instance. We think that Krzyzewski shows us that you can get there on regular statutory construction principles that don't deal with the questions that the court has been using in the major questions doctrine in its more recent cases. Don't you think that this is the sort of problem that should be addressed by somebody, either by Congress or by this court? As a practical matter, let's consider what's involved here. As I understand it, the Sacklers, the Bankruptcy Court, the creditors, Purdue, and just about everybody else in this litigation thinks that the Sacklers' funds in Spendthrift Trusts overseas are unreachable. Do you agree with that? And if you do agree with that, is this the best deal that's available for the creditors? Well, I don't think we have a reason to think that Spendthrift Trusts overseas might be unreachable. I do think that the Sacklers think that they are at risk, and that's why they've offered up $6 billion here. I think to the extent that the other side is saying this is the best possible deal, we think that that's a reason why wide-scale consent is more likely to be a viable solution here. And yet it's appropriate for us as a watchdog for the bankruptcy system to say that the court can't exceed its statutory authority here, and it can't simply redistribute others' private property rights because we think that that's the best deal available and it would serve the greatest good for the greatest number. Do you think they are reachable? I certainly think that the Spendthrift Trust assets in the United States are reachable, but I think that would be something that could be explored if there were a bankruptcy with the Sacklers. But I think that it's important to recognize here that $4.2 billion was the last best possible deal when we were before the bankruptcy court, and they said that take it or leave it, $4.2 billion is what you get. We need a nonconsensual release in order to get it. But then when the district court went the other way, all of a sudden they were able to produce 39 percent more money, $1.675 extra billion. Just one more follow-up. What if a bankruptcy court were faced with a situation where funds like this are not reachable? You're saying that the bankruptcy court is powerless to do anything. Well, I am saying that to the extent that we're talking about property that is not property of the estate, it is beyond what could be obtained in a fraudulent conveyance action that the estate has, then that's something that the bankruptcy court can't dispose of. But we think that that principle applies on both sides of the deal. If the fraudulent conveyance claims could reach those assets, they could be brought in forcibly through the bankruptcy procedure. To the extent that the Sacklers want to have some of the benefits of bankruptcy without fully participating, we think that they need to get consent. Counsel, what does consent look like? I've been trying to imagine that in a case like this. You have the states so they could consent. They're an identified party. But there's, I don't know, thousands, if not hundreds of thousands, maybe millions of personal injury claims. Is an opt-out consent? How do you get it? Well, our position, the U.S. Trustee's position, has been that opt-in consents are necessary for the type of independent force waiver of property rights that I was discussing with Justice Thomas. But not opt-out provisions? Not opt-out. I think that those may be different with respect to the constitutional concerns, but with respect to the question of establishing that somebody has actually waived their property rights here, we've said opt-in is required. We think that there should be affirmative consent. Of course, here there isn't any form of consent at all. So basically, you're telling Justice Alito that there really is no way to do this in bankruptcy right now, because I don't know how an opt-in process would actually work. I wouldn't say that there's no way to do this in bankruptcy, Justice Sotomayor. We cite the PG&E case, which is a mass court in California arising from wildfires. That came in the Ninth Circuit, which doesn't permit nonconsensual releases, and that has an opt-in term, and that was used to resolve the claim there. Was that one of the cases where there was a promise to pay all claims? There were a couple of mass court claims where there was an agreement that all claims would be paid in full. That's not going to happen here. Well, I don't think that that's – the other side is telling us that that's not going to happen with respect to the money, the claims that exist against Purdue, and we understand that that's what bankruptcy is for. If Purdue is insolvent and its money isn't going to go far enough to pay off all the claims, that's why the bankruptcy court and its powers can be used to restructure the relationship between Purdue and its creditors. But that doesn't mean that somebody else gets to say, well, we're going to create a supplemental limited fund and take advantage of the same procedures. And so we think this is particularly inconsistent with Section 524E of the code, which says that a discharge doesn't release any other entity. If you think of somebody – if you think of a regular case in which there's co-tort feesers who have joint and several liability, the first defendant goes into bankruptcy and is going to pay $0.10 on the dollar. The discharge of that defendant doesn't relieve the second defendant of the need to pay the other $0.90. And that doesn't change if the second defendant says, I'll chip in $0.05 for every dollar in defendant one's bankruptcy. Can I ask, Mr. Gannon, about your understanding of the term appropriate? Because that seems to be the key statutory term here, appropriate, which is a word that's broad. And in thinking about what's appropriate, we have 30 years of bankruptcy court practice that have approved releases of this kind in certain narrow circumstances, where the parties are, for example, as here, officers or directors of the company, where they're indemnified, meaning that the claims against them are, in effect, claims against the company, where the directors and officers have made contributions for distribution to the creditors, and where your opening never mentioned the opioid victims. The opioid victims and their families overwhelmingly approve this plan because they think it will ensure prompt payment. So in those circumstances, those narrow circumstances, bankruptcy courts for 30 years have been approving plans like this. And I guess I'm trying to figure out, with all that practice under the judiciary's belt, why we would say it's categorically inappropriate when the statutory term appropriate is one that takes account, usually, of all the facts and circumstances. I take the point that appropriate can do a lot of work there. We think that it's not appropriate to simply take property rights that aren't accessible to the estate in bankruptcy. And you mentioned the indemnification agreements, the directors and officers. This really sweeps much more broadly than that. It isn't just people who are directors and officers. They may be the main ones who need the release, who would have the most liability. But the indemnification claims don't cover everything in here. And there's an exception in the indemnification agreement for good faith. So it's not even clear that this indemnification agreement was going to be enforceable in the context of this case. That's a fair point. But more broadly, I think what the opioid victims and their families are saying is you, the federal government, with no stake in this at all, are coming in and telling the families, no, we're not going to give you payment, prompt payment, for what's happened to your family. The federal government is not going to allow all this money to go to the states for prevention programs to prevent future overdoses and future victims. And in exchange really for this somewhat theoretical idea that they'll be able to recover money down the road from the Sacklers themselves. So I guess when thinking about the term appropriate, I guess I'm not sure why we should cast aside that concern so readily. I don't think we're casting it aside. I think we are saying there are 2,600 creditors, personal injury victims, who objected to this plan. And we do think that... I mean, it's 3%. You know, what if it were 1%, 0.1%? And your position would still say, well, no, the trustee can come in here and blow up the deal and should blow up the deal. Our position is that if you can get 99%, you're going to have a deal. There are going to be a handful of outlying claims that you couldn't get covered by consent. That's about where we are, Mr. Gannon. If they're small claims... It's overwhelming, the support for this deal. And among people who have no love for the Sacklers, among people who think that the Sacklers are pretty much the worst people on earth, they've negotiated a deal which they think is the best that they can get. They have negotiated that deal. They think it's the best they can get. The deal has evolved even over the course of this case. It has gotten better, notwithstanding the fact that they thought they had the best deal when they were in bankruptcy. Well, are you contesting, when you were talking with Justice Alito, are you contesting the finding that this provision was necessary for the reorganization? Well, I think that that was falsified by the fact that it got renegotiated as soon as the district court ruled. And our point is that we're not casting aside the 3%. We're saying that if there are a handful of small outlying claims, the Sacklers can deal with those on the side. They can get consent that takes care of everything else. If there happen to be some large outstanding claims for people who don't want a consent, then we think it's a much bigger deal then that that property right is being taken and extinguished without those parties' consent. Your position rests on a lot of sort of highfalutin principles of bankruptcy law. But another highfalutin principle of bankruptcy law is you're supposed to maximize the estate. And you're supposed to do things that will effectuate successful reorganizations. And it seems as though the federal government is standing in the way of that as against the huge, huge, huge majority of claimants who have decided that if this provision goes under, they're going to end up with nothing. Well, we hope and expect that there would still be a deal if this court says that consensual releases are okay. So we don't think that they're likely to get nothing. We do think that even if this had to go through bankruptcy, that the fraudulent conveyance claims have value. There's a reason why the Sacklers have already been willing to offer $6 billion. And we see this in other cases. In the Arrow case with 3M, when they were in bankruptcy and they wanted a non-consensual release, they were willing to offer $1 billion. When bankruptcy fizzled, within two months they negotiated a settlement where they were paying up to $4.8 billion or more. I was just going to ask you what the United States' position is going to be. Let's say that you win and it goes back down. The Sacklers withdraw their offer to contribute all these billions of dollars. You have a super priority claim that would deplete most of what's on the table based on Purdue's assets right now. Would you assert that claim or would you withdraw that and allow the opioid victims to recover what's left in Purdue's estate? Right now that claim is part of the criminal guilty plea. It's a criminal forfeiture judgment for $2 billion, which we've agreed to stand back and allow the states and other governments to take $1.775 billion of it if it goes forward. But this is contingent on the guilty plea, which is contingent on the confirmation of the plan. Purdue, if the plan doesn't get confirmed, doesn't need to go through with the guilty plea. We might not have the $2 billion judgment. We think that this would be part of a negotiation on remand to the extent that consent is possible. Until there's plan confirmation, we don't have a finalization of the sentence and we don't have the $2 billion judgment. What if there's just liquidation of the company, which is what the other side raises the specter of? So there's liquidation of a billion, there's no contribution, and then everyone's left with a lottery ticket to try to get something in litigation years from now. As I said before, I do think that there is value to the fraudulent conveyance claim that the estate has against the Sacklers. It may not get to the Spendthrift Trust overseas that Justice Alito was asking about at the beginning. But I also think that the Sacklers are saying that they want global peace, but I don't think that that means that they wouldn't pay a lot for 97.5% peace. And so I do think that there's a very good chance that there is a deal on the other side of this. Maybe I'm misunderstanding your dialogue with Justice Kagan, but are you saying that you shouldn't allow this because there's going to be a better deal down the road? That is not what we're saying. We're saying you shouldn't allow this because it takes property that is not part of the estate and disposes it as part of the bankruptcy. And I'm saying to the argument that this is necessary and bankruptcy courts should just do the best they can that we're not even persuaded that this is necessarily going to be the best deal. Well, that's what I want you to say. Your point is it's not going to be the best deal. It might be a better deal. I mean, your argument is based on a principle that would apply if there were one. That is correct, Mr. Chief Justice. So you would be here making the same argument if everything was as the way it is, except that in terms of the claimants who do not want to be bound by the order of the banks, but there was just one of them. I would say that to the extent that their claim is not property of the estate, it can't be forcibly extinguished by the bankruptcy court. And if that's an outlying claim that couldn't be included in a consensual agreement, then it can presumably be handled on the side. And if it turns out that there are too many outlying claims and the Sacklers end up being insolvent because of this, then bankruptcy for them might be the answer to that. But right now, a non-consensual deal or a single bankruptcy proceeding just might not be the answer to this situation. And I understood that the reason why you're saying that is because you're not necessarily hanging your argument on the appropriate language of the statute. But instead, you're saying that it's inconsistent with the bankruptcy code to allow for this process. Am I right about that? I mean, Justice Kavanaugh brought up appropriateness, and I'm just trying to understand if that's the hook that the government is resting on or the government is making the argument about inconsistency. I think we're making both arguments. We do think that this is inconsistent with several provisions of the code. The ones that talk about the scope of a discharge, who's eligible for it, whether it could include things like claims for fraud and willful misconduct, whether you have to provide all of your assets. Because we do think that this release with the injunction is the equivalent, the functional equivalent of a discharge for the Sacklers, that that makes it inconsistent with the way the bankruptcy code operates. I would also say that that may make it inappropriate, and it's not appropriate in light of the colloquy I had with the Chief Justice about B-1 through B-6. We just don't think that this is the sort of thing that would be living in that catch-all provision at the end of that case. I guess I'm just a little worried about hanging it on appropriate because I'm trying to understand the standard by which you are evaluating that. I mean, if we're just talking about appropriate in the sort of general sense of people agree with it and many people would like it to happen, then I guess you don't get appropriate. But if we're looking at appropriate and inconsistent relative to the overall purposes of the bankruptcy code, the various provisions that you've pointed out, then I suspect you do. Yeah, and I think that we could win under either of those rationales, and I think that in cases like energy resources, the court reached its conclusion when this provision was located under B-5 by just saying that that instance was something where the provision was consistent with the traditional understanding and it was part of the bankruptcy court's authority to modify creditor-debtor relationships. And we don't have that here, and so that's why we think that it doesn't fit within either half of the catch-all provision. Can you speak to the respondent's suggestion that the only way that something is inconsistent with the bankruptcy code is if it directly contradicts a provision of the code? Is that the government's understanding of inconsistent? No, and I don't think that that was the way the court had construed other cases like Tchaikovsky and Radlax, where the court looked at provisions, looked at things that bankruptcy courts were trying to do, and said, now this is something that isn't expressly prohibited by any provision of the code, but that doesn't mean that it isn't sufficiently inconsistent with other parts of the code that it's permissible. And so in Radlax, the inability to prevent a secured creditor from using credit bidding when there was an auction for assets was permitted under – you couldn't prevent a creditor from using credit bidding in an auction under one provision, and the court said that that means that you can't use another provision to allow that. And so here, we would draw a similar inference from the idea that in B3A, you can settle claims that belong to the estates. That doesn't mean that you can settle claims that don't belong to the estate. Thank you, counsel. Justice Thomas? Mr. Gannon, once again, just taking the position that whether or not the analysis is consistent or inconsistent with the code, would you again tell me why a consensual agreement or release is consistent with the code? We think that it's consistent because it is not extinguishing a property right without the property owner's consent. We think that all over the law that consent is a basis for parties to agree to waive their rights. We cite the Lawyer Against the Department of Justice case for that. And because the court then does not need to use the powers of the Bankruptcy Code to extinguish the property rights, that that doesn't need to be part of the plan. The plan doesn't need to say, I am hereby releasing this claim. The claim has already been released by the force of the party's contractual agreement. There doesn't need to be an injunction that says you can't enforce that claim that you already waived in a contract because that contract is going to be separately enforceable. And so the consensual release doesn't need the force of the Bankruptcy Code and the Bankruptcy Court in order to take effect. And what exactly is the interest of the trustee in doing that, in undoing this? Well, as I said before, we think that we do have a watchdog role. I'm not sure if you're asking a standing question. Well, in a sense I am, because it seems as though, and there's been some discussion about that virtually, that the vast majority or overwhelming majority of those who have claims are interested in having this resolved. But the trustee has a separate role. And I'm just wondering what exactly is that role and why is it that you're able to come in and undo something that has such overwhelming agreement? Well, we're able to come in because Congress specifically said under Section 307 that the trustee can raise and may appear and be heard on any issue in a case under the Bankruptcy Code. But normally you see someone like the Attorney General has separate authority to regulate, specifically to enforce certain provisions, and it doesn't seem that you have that here. Well, the trustee has been given this watchdog role and has been told by Congress to participate in these proceedings. The trustee cannot initiate a Chapter 11 proceeding, but is expressly authorized to raise issues in a Chapter 11 proceeding. And the trustee does this in hundreds of cases a year. We cite a statistic in our opening brief. And we were a party in the District Court, in the Bankruptcy Court, in the District Court, in the Court of Appeals. And we are doing that with Congress's imprimatur that it is the trustee's watchdog role that helps ensure that there's a disinterested observer who is able to ensure that the bankruptcy courts are applying the Bankruptcy Code appropriately. And so our interest is in having the bankruptcy laws enforced appropriately. Justice Alito, you argue that we should adopt your interpretation because it avoids a difficult constitutional question. Are you willing to express a view about whether this is constitutional? Well, I think that the constitutional concerns, we haven't raised it in this court as a separate constitutional question because we think that constitutional avoidance is sufficient to get us there. But I think that the fact that there's not even an opt-out release means that there's a due process problem under the way this court has dealt with class action cases where the court has said that plaintiffs have a due process right to remove themselves from a class. And there is an enforceable extinguishment of property rights. And the other side says there's a hearing with respect to that, but it's a hearing that didn't even consider the merits of the claim. It specifically said that you get nothing. That doesn't even matter because I think that it's just better enough that you're getting more for the other claim. And as I said before, we don't think that that's the right analysis. If you had joint and several liability for co-tort fees, it certainly can't be the analysis when you have claims that don't even overlap as much as those claims do. Thank you. We have a separate petition in Highland Capital. And the amici briefs argue that or suggest that your argument here about non-consensual third-party releases affects the question of exculpation clauses for professional services firms that work on a bankruptcy. Does it? How do you get around? I know you're not arguing that case, but you are arguing that third-party releases of the peers. You want a broad ruling that all third-party releases, unless they're consensual, are not permitted. So how do we write this not to affect that case or any others that have to do? We have responded to the court's request for the views of the Solicitor General in that particular case and acknowledge that there's a great deal of overlap between the question here and the question in that case involving exculpation provisions. And so I take the point in the amicus briefs that third-party releases come in lots of different flavors, as we've already made it clear today, that we do think that consensual ones we think are OK, even though non-consensual ones are not. And we think that derivative claims are OK, direct claims are not, because the derivative claims are property of the estate. Exculpation clauses, depending on how they're written, may overlap a lot with this. We think that there are similarities in the legal analysis. The court would go about the same type of question, asking itself whether this is something that is consistent with a tax structure and traditional equitable authority that bankruptcy courts had. There's also a common law immunity doctrine floating around in the context of exculpation clauses. I think the court could say, you're resolving a dispute like this. This is waiving, you know, pre-petition claims that are property that is not property of the estate. That's this most egregious form of a non-consensual release, and leave that for another day if you need to. Justice Kagan? Mr. Gannon, I take it there's no amount that the Sacklers could have put on the table that would alter your position, is that right? I think if they put enough on the table to get people to consent and have an agreement, but I think that that's right. This is not about whether they... Because the reason I ask is one of the stronger arguments you make in your brief is that this upsets the basic quid pro quo of bankruptcy law, which is you put all your assets on the table and then you get a discharge. But suppose, in fact, that the Sacklers had put all their assets on the table. Why shouldn't that change the analysis under your own theory? Well, I suppose that if it really is that, and we know that it's everything, even though we haven't had all the safeguards of the bankruptcy process, then that would feel different. I still think that it's important that they need to go through the same process and be subject, then they would get the release. But I think if they were willing to do that, then maybe they'd get consent. I'm not sure why they wouldn't want to be in bankruptcy if they're really giving up all of their assets. Possibly, really a truly hypothetical hypothetical, but it seems that your basic position would still apply if there was one kind of nutcase holdout. And so I guess I'm wondering why one nutcase holdout should hold up something like this. Well, and our view is that if that person is making a claim for an amount of money that they're never going to be able to get, then they should go to trial on that. They should settle it. They should do whatever they need to do in order to deal with that claim on the side. If it's a significant claim and somebody doesn't want to waive it, we think that you don't have to consider that person a nutcase to say that it's their right to decide whether or not they get to waive their personal property rights. Justice Gorsuch, even if they put all their assets on the table, they still wouldn't get a release for fraud, right? That's not if somebody were willing to pursue that claim after the bankruptcy. That's correct. And so that their assets, not just in the past, but in the future, would be potentially attachable by creditors. Correct? That is absolutely correct, Justice Gorsuch, and that may well be a reason why it would still seem quite inconsistent with the Bankruptcy Code for that deal to be approved. And then your discussion with Justice Alito about constitutional concerns, you mentioned due process. How about the Seventh Amendment, which you just briefly alluded to in response to Justice Kagan as well? We've raised the Seventh Amendment as a statutory argument in light of the provision of Title 28 that says nothing in the Bankruptcy Code will derogate from that in the context of wrongful death and personal injury claims. So we do think that that's a significant issue here, and it's notable that this plan accounts for Seventh Amendment rights for people who have claims against Purdue, but not for those who have claims against the Sasslers. And so the amicus briefs discuss the Seventh Amendment itself more extensively. I just wanted to make sure you agreed with them and saw nothing in them that was erroneous. No, we think that there are private claims here that the Seventh Amendment would apply to. Thank you. Justice Kavanaugh? Some of your rhetoric, as compared to your position, but some of your rhetoric today has been that the Sasslers just haven't put in enough, in particular in your colloquy with Justice Kagan. Your position's like there's no amount they could do, but your rhetoric's been they haven't put in enough. On that point, isn't the discovery process that the bankruptcy court commissioned and oversaw that was very thorough, at least from this perspective, and you may have critiques of it, designed to ensure that the amount contributed by, in this case, the directors and officers and the like, is an appropriate amount to increase the value of the res, and therefore help the ultimate creditors and victims? I take the point that there was discovery into that. There's more information about these assets than there usually is for assets that are on property of the estate. I take that point. Part of that was getting into the question of what the value of the fraudulent conveyance claims would be here. That's important information that's been available to the process, and the bankruptcy court had that information before it, but we still don't think that that's the same thing as saying that the Sasslers have actually made all of their assets available to the estate. That's the big distinction, is that nothing in bankruptcy would let somebody say, you know, I'm insolvent because I've decided that only a certain portion of my assets should be used to pay my debts. The deal isn't that. You have to come in and say that to the extent that things are property of the estate, this is what I'm making available to satisfy claims against me. I think the problem and maybe the disconnect between you and the opioid victims is you're implying or even saying, oh, if you just can't reject this plan, there's going to be more money available down the road from the Sasslers. And I don't think you're accounting for the uncertainty of liability, first of all, the uncertainty of the indemnification insurance contribution claims, and the uncertainty of recovery. And so the point of this provision, as it's been applied for 30 years, is to take into account those uncertainties in thinking about whether this is an appropriate settlement and overall plan. So what's your response to that? And I think that the record shows that what the best deal is here depends in large part on what negotiating leverage they have. And if the court says that non-consensual releases aren't part of that, the deal may change. I certainly take the point that there's a lot of uncertainty, and all the people on the other side of this table and lots of other people have been involved in years of conversations about what the best possible deal could be. The use of the opioid victims and their families is not – doesn't matter. I'm not saying it doesn't matter. I think your position is saying it doesn't matter. Our position is saying that there are other opioid victims with also heartbreaking and tragic losses that are saying we are not consenting to have our property rights forcibly extinguished in this way. We are not comfortable with being part of this proceeding as you have designed it. One last question, which is you made a distinction between derivative claims and direct claims, which I understand from your brief as well. But I think the big theory of the other side, and I touched on this earlier, is that the releases here combined with the contributions to the res are helping the overall res because the indemnification provisions would mean in essence that a suit against the Sacklers would be a suit against Purdue. And you touched on that earlier, but that's still a sticking point. So I just want to make sure I have that down. In other words, when they rope them into this plan, in essence, they're helping to protect the res because those suits would, if indemnified, deplete the res. Yes, I take the point. I want to make it clear that there's no doubt here that this plan does – the release here does apply both to direct claims and derivative claims. They're both enumerated separately on page 274 of the joint appendix. And the lower courts agreed about the fact that there are some direct claims here. The indemnification provision, as I mentioned before, Justice Kavanaugh, that's something that doesn't apply to all of the claims that are at issue here, even to the extent that it does apply. There's a good faith exception, and therefore it may be for naught. Even apart from that, under Section 502, it could be disallowed precisely because it's contingent, or there could be equitable subordination under Section 510 where it could be said that this claim should stand behind the claims of the victims, who should be able to take before the Sacklers can collect on whatever's left of their indemnification claim, which will only apply to some of these claims against them, and to the extent that the good faith exception hasn't been triggered. Thank you. Justice Barrett? Mr. Gannon, explain to me how that will work, because I had this question about indemnification, too. But it seems to me – and maybe it's just I need to get a handle on what the sequencing would be here. But let's say that the bankruptcy wraps up, but because some people have not – and let's imagine you win. Let's imagine the bankruptcy wraps up, and people do go after the Sacklers, and let's say they secure judgments, and the Sacklers want to seek indemnification from Purdue. As I understand it, there's a division of authority in the courts below about whether these would be pre-petition or post-petition claims, and so whether they would even be allowed. But I also am wondering, what's left to get? So if they're bringing these indemnification claims, and Purdue has been restructured, where are they going to get money anyway? So I just don't understand how it affects the Reds in the way that the respondents say. Frankly, I'm not sure where that would happen in this case, in part because of the question you have about whether these would be considered pre-petition or post-petition indemnification claims. I do think that equitable subordination could still be an answer here to the extent that any of them were pre-petition. And I'm not sure how it would be resolved against a reorganized Purdue after the fact. If it's a post-petition claim, then it may still be available against them. But if it is available against them, what assets are there to get once Purdue is reorganized? I guess is what I'm saying. I think that would be the answer for Purdue, but I think that this is still depending upon lots of other questions about how much of the indemnification provision applies. I understand that, but I'm just saying to the extent that they say this affects the size of the Reds, it doesn't really affect the size of the Reds that would be distributed during the bankruptcy proceedings, so far as I can tell. And maybe respondents can address that when they get out. Maybe so. I do think that the good faith exception is something that plays into the question of valuing how much the indemnification claim would be to the extent that it is a pre-petition claim and it's being estimated as part of the reorganization. Okay. And then this other question is about the ramifications of a win for you. I mean, we're talking about this in the particular context of the opioid litigation, but this question about non-consensual releases, non-consensual non-debtor releases has come up in other contexts like the Johnson & Johnson litigation, et cetera. If you win, I mean, it just seems to me like this is a very complicated problem for a lot of the reasons that a lot of the questions that people have been asking you about, well, is this the best that we can do for the victims? Lots of victims have agreed to it for that reason, even though it seems like the amount that these victims have agreed to it get, it's a pretty limited range. But in any event, this is a very complicated problem in mass tort litigation that involves bankruptcy. So what happens to those other cases if you win? Does this have ramifications for other victims of mass torts that would be negative in cases like the Johnson & Johnson litigation? Well, I think the Johnson & Johnson issue is a slightly different one. There's a brief about the so-called Texas two-step there. The cases that are more on point, there are amicus briefs about involving the Catholic Church and the Boy Scouts. To the extent that a case is there's a final and non-appealable judgment, then that sticks. This court had addressed that in Travelers Against Bailey and specifically said that it was too late to challenge the scope of a release, regardless of whether or not it was lawful in the first place. I think I haven't stated my question correctly. I don't mean or in a way that's clear enough to you to elicit the answer I want. I'm not talking about the cases that are actually pending. I'm saying going forward, depriving bankruptcy courts of this tool, what will be the effect going forward on other cases like this? Yeah, I take the point. And I would say that even in the Catholic Church cases, there have been Catholic diocese bankruptcies in the Fifth Circuit and the Ninth Circuit. And so they have proceeded without consensual releases. And ultimately, as I alluded to before, this may not be the best solution for every mass tort. A single bankruptcy in which there are participants on the sidelines who are contributing may not be the best solution. If Congress wants to step in, as it did with 524G, and create a customized framework for some of these individual situations, it could do that consistently. So you would say that would be a good solution given the complexities to have Congress do it rather than bankruptcy courts trying to stretch the code? We never quarrel with the idea that Congress has the authority to amend statutory authority. Has an important role. Okay. And then a question about the victims for whom you are speaking or those with claims who have not consented. Do you see yourself, as representing the trustee here, do you see yourself as speaking for those who did not consent, the small percentage? Or, you know, there were hundreds of thousands of victims that didn't respond. Are those the ones that you're concerned about? Well, I think we're concerned. About all. We're concerned about the entire process. We are concerned about the fact that we don't think that there's meaningful consent when somebody just didn't even vote. I mentioned that less than 50% of the personal injury claimants voted here. And so the 97% in favor figure depends in part on a high, you know, non-voting percentage. But our role is in making sure that the process is working as it's supposed to. And so we're not the lawyers for these individual claimants. They have their own lawyers, some of them before the case. But we're speaking for the idea that if they have property rights that are not property of the estate, then that's not. I understand that. I guess what I'm saying is when you're talking about the property rights, you're referring writ large to maybe what we might call like some of the invisible debtors who just didn't vote, who didn't respond. Yeah, and we think that that's definitely not consent in a way that we think would make this waiver appropriate. Thank you. Justice Jackson? So Justice Kavanaugh mentioned the couple of decades of practice of bankruptcy courts approving these kinds of things. And I'm just trying to understand where the history leaves us, because I had understood that under the previous version of the code, this court in Callaway had said that this kind of thing is not acceptable. So can you just say a little bit about the history and how we should be thinking about that? Well, we are saying that we think that this is a statutory construction case under the code, and we think it's inconsistent with the code for all the reasons that you and I were previously discussing. But part of that is because there isn't a strong historical analog, and there is a really small amount of history that's been put on the table by the other side. And we do think that the Callaway case from this court in 1949 certainly cuts strongly in the other way. The other side says, well, in part that was for jurisdictional reasons rather than whether there was particular authority. But it still meant that courts were not doing this under the Bankruptcy Act. The only other cases that have been cited are a couple of district court cases that we think are relatively easy to distinguish from a third-party release. All right. And just conceptually, I guess I'm trying to understand why this would be laid at the feet of the one-net case holdout, as Justice Kagan puts it. I mean, I thought, and maybe this is the argument that you're making, that even if you have a group of people who do not consent, the Sacklers could still give the money. They could still fund the victims who do consent. And so it's not the holdouts. It's the Sacklers' insistence on getting releases from every single person that's causing this problem. Correct? That's correct. And as I said before, to the extent that they say they want global peace, then I understand that desire, but that doesn't mean that they're not going to pay a lot for 97.5 percent peace. And your only point is that they may still, if the court says no, go ahead and settle with all of the people who are willing or interested in doing this. Yes. To the extent that the vast majority of people are saying, this is a great deal, we want to be part of it, then that much of the deal can go forward. Thank you. Thank you, counsel. Mr. Garr? Thank you, Mr. Chief Justice, and may it please the court. This court should reject the trustee's argument that non-consensual third-party releases are categorically unauthorized by the Code, no matter the circumstances. I'd like to begin with three points. First, the trustee's position is irreconcilable with the plain text of Section 1123b-6. Congress's use of any and appropriate terms of breadth and flexibility refute the trustee's position that third-party releases are never authorized in any circumstances. Second, this case illustrates how third-party releases can and do directly advance the core objectives of bankruptcy in appropriate and appropriately limited circumstances. Because of the inextricable relationship between Purdue and the Sackler directors and officers of Purdue, victims have filed identical claims against Purdue and the Sacklers for the same injuries based on the same conduct. Everyone agrees that the claims against Purdue can be channeled to the creditor trusts. The releases simply prevent creditors from jumping the line and depleting the estate through the back door by suing the Sacklers for the same injuries based on the same exact conduct involving Purdue. That explains why the creditors and victims themselves insisted on and have overwhelmingly approved the releases. And finally, third-party releases have been used in limited circumstances for more than three decades, nearly the life of the current Code, to resolve some of the most important and complex bankruptcies. Equity has likewise enjoined third parties in analogous circumstances for centuries. Adopting the trustee's categorical rule would radically disrupt that long-standing practice to the detriment of victims. If the trustee succeeds here, the billions of dollars that the plan allocates for opioid abatement and compensation will evaporate. Creditors and victims will be left with nothing, and lives literally will be lost. Nothing in the Code commands that tragic result. I welcome the Court's questions. Mr. Garr, the government, the trustee, treats consensual agreements and non-consensual releases differently. How would you respond to that or react to that? I think the most telling point of my friend's response, Justice Thomas, was that he didn't point to the text of Section 1123b-6 at all. In order for that to be a component of the plan, it has to be approved by the Bankruptcy Court, and although he talks about the agreement of the parties, there has to be statutory authority for the Bankruptcy Court to include that. The only basis for that authority comes from 1123b-6, and that doesn't draw a distinction between consensual and non-consensual. So I think my friend's response shows the difficulty with that position for him. If there were no previous or prior indemnification agreement, would your argument be the same with respect to the releases? It would be, Your Honor, because for the simple fact that the sheer litigation of these claims against the Sacklers, because they must include on Purdue's own conduct to be subject to the releases, would inundate and overwhelm Purdue and deplete the race. And that's the simple fact due to the nature of these claims. Mr. Carr, as I suggested to Mr. Gannon, I thought that one of the government's stronger arguments is this idea that there's a fundamental bargain in bankruptcy law, which is you get a discharge when you put all your assets on the table to be divided up among your creditors. And I think everybody thinks that the Sacklers doesn't come anywhere close to doing that. And the question is, why should they get the discharge that usually goes to a bankrupt person once they've put all their assets on the table without having put all their assets on the table? Right. Well, let me first say, Justice Kagan, that the point of this proceeding is not to make the life as difficult as possible for the Sacklers. It's to maximize recovery and fairly and equitably distribute it to the victims. I guess what I'm suggesting is that this is a fundamental principle of bankruptcy law. And when we're trying to read this provision and figure out what powers it gives to the bankruptcy court and whatnot, it would be a kind of extraordinary thing if we gave the power to basically subvert this basic bargain in bankruptcy law. Right. And that goes to my second point, Justice Kagan, which is that they're not getting a discharge. They're getting a release. And there's a fundamental difference between that. A discharge in bankruptcy law is essentially immunity from all claims except for narrow exceptions, whereas the releases here apply only to one set of claims, prepetition claims by creditors based on the debtor's own conduct. That is not a discharge. In some ways, they're getting a better deal than the usual bankruptcy discharge because, as Justice Gorsuch indicated, they're being protected from claims of fraud and claims of willful misconduct. So, yeah, in some ways they're getting not quite as much, but in some ways they're getting much more. So I think that underscores the... And again, without putting what I take to be anything near their entire pot of assets on the table. So as to the individual debtors, Your Honor, I think it underscores the fundamental difference between this reorganization proceeding and individual debtor proceedings. The exceptions from discharge for fraud apply to individuals, not corporate reorganizations. In this case, everybody agrees that the many claims for fraud against Purdue can be channeled to the trusts. And that's because in this reorganization proceeding, the focus is on maximizing the estate and equitably distributing it to all of the victims. And what the trustee proposes here is fundamentally at odds with that core objective of bankruptcy. And again, as Your Honor's questioning pointed out, it doesn't matter how much money the Sacklers would put into this. Their position is the same. Nonconsensual releases can never be authorized by code. But even if they could be authorized, Mr. Garris, you said at the beginning, why would this be an appropriate situation to allow it? So Justice Kagan says they're not putting all of their assets on the table. But my understanding is that not only are they not doing that, but most of the assets we're talking about were originally in the company. And that they actually took the assets from the company which started the set of circumstances in which the company now doesn't have enough money to pay the creditors. So even if there was a world in which categorically we wouldn't say you can never do these kinds of releases, why wouldn't this be a clear situation in which we would not allow it? Well, first, the trustee's position is it doesn't matter on the circumstances. But this case actually illustrates exactly why these releases should be allowed, Justice Jackson. I mean, first of all, on the transfers, most of that, 40% of that money went to paying taxes. Of what's left, 97% of that is in the $6 billion that's in this settlement. The bankruptcy court here made careful findings that this contribution not only was substantial and fair, but it was the best that was available here for the victims. And there are also serious collection issues that the bankruptcy court found, Justice Alito, that if this settlement doesn't go forward, then victims would likely, even if they prevailed on their claims, prevent serious issues about being able to collect on that. It's only because the Sacklers have taken the money offshore, right? I mean, it's not like by operation of law it's necessary to do this. It is necessary to do this because the Sacklers have taken the money and are not willing to give it back unless they have this condition. And I'll add to that, if I could just piggyback on to what Justice Jackson said, the money, I mean, I take your point about 40% of the money that they took from the corporation going to the payment of taxes. But as Justice Jackson rightly points out, the 97% of the money after tax that they're contributing is all money that they took out of the corporation. And to your point to Justice Kagan about, well, this is a corporate restructuring, and so the fraud position doesn't apply, I take Justice Kagan's point to be, but if the Sacklers went into individual bankruptcy, which is what this is saving them from, those fraud exceptions would apply. So I think, I mean, first on the question of individual bankruptcies, the Sacklers are not an entity. Many of them live overseas. Much of what we talk about the Sacklers are actually trusts that aren't amenable to the bankruptcy process. So we're talking about, you know, a very small number of individuals that even could declare bankruptcy. Their net worth of the Sackler directors and officers in the United States is about $1.2 billion. The $6 billion obviously exceeds that. And, again, the trustee acknowledged below that their position would be the same if the Sacklers were putting $10 billion into this settlement. Let me see if I can come at it this way. So we're being asked to interpret 1123b-6. And you'd agree that the term appropriate doesn't mean anything goes, right? Correct. It has some limits. And we would normally look for those limits, for example, in the structure of the bankruptcy code and other surrounding provisions, right? I mean, I don't want to put structure in the broad sense because I don't think just talking about installs. Well, certainly you would look at other provisions. Okay, all right. And we might look at historic equity practice. I think that could be relevant, Your Honor. And we might look at background constitutional concerns. Yes, you would interpret it in any statute, Your Honor, but with respect to constitutional doubt, though, that wouldn't apply with a statutory term. But you'd agree we wouldn't turn a blind eye to the Constitution of the United States when interpreting a statute. Well, unless the statute was unambiguous, Your Honor. And here I think it's unambiguous it applies to at least some. I'll take that as good enough for my purposes. When we look at the background structure of the bankruptcy code, it has a couple of important provisions, right? One is you've got to put everything on the table, as we've been discussing, right? Yes. And the other is that at least with respect to individuals, you don't get off the hook for fraud, right? With respect to individual proceedings, Your Honor, not in this proceeding as to the corporate case. Okay. And then when we look at historic equity practice, I think you've got a couple of cases from the 1600s and a couple of district court cases more recently, and pretty much nothing else. So, I mean, I'm asking about all of those. There's a lot running the other way, right? I mean, with respect to the statute itself, I think one word that we haven't talked about today is applicable. That's in section 226. Well, I'm asking about equity practice. Oh, with respect to equity practice. You've got a lot running against you, don't you? No, Your Honor, I don't think so. I mean, we've cited cases. What was that case from the 1600s? The Tiffin case. Tiffin, Tiffin, that's right. Where the court of chancery enjoined third parties, suits against third parties. Okay. We've got the limited fund context that this court has recognized. And then on the constitutional question, we have serious questions. We don't normally say that a non-consenting party can have its claim for property eliminated in this fashion without consent or any process of court other than, you know, the procedure here. This would defy what we do in class action contexts. It would raise serious due process concerns and Seventh Amendment concerns, as the government highlighted. You're normally entitled to a jury. Right. I think, Your Honor, bankruptcy is different for starters. And I think that, you know, one example I can give you is a derivative claim. But we're not in bankruptcy. That's the whole point is your clients aren't in bankruptcy. If they were, then equity would kick in. Everybody here in this case before this court is part of this bankruptcy proceeding. They've submitted proofs of claim. And that's one of the reasons why they don't have a Seventh Amendment objection here, Your Honor. With respect to a debtor, that would be traditionally the case. But we're talking about a non-consensual claim against a non-debtor. Right. And that normally would have serious due process and Seventh Amendment concerns. So I can give you several examples of where the court has recognized that or where it's allowed generally. The derivative claims. These are claims held by third parties, intentional fraudulent transfer claims, alter ego claims, veil-piercing claims, breaches of fiduciary duty. By virtue of bankruptcy law, those claims are taken away from the creditors, the third parties, put in the states, the estate, and settled. Even though if they had held those claims, they would have gotten recovery directly. So that history, no one disputes that here. My friend acknowledged it today. It's fundamentally inconsistent with its position. And joining third-party litigation. This court in the Celotex case recognized that bankruptcy courts can and join suits between non-debtors, specifically citing third-party releases in these sorts of cases that cited the Dulcan Shield case. The energy resources case, Your Honor. This court recognized that 1123b-6 applied in the context where what the release did was discharge the liability of a non-debtor, the officer of the company, to another non-debtor, the IRS. In fact, the fact that 1123b-6 would allow a bankruptcy court to tell the IRS how to allocate his tax funds and discharge, effectively discharge the liability of someone from IRS taxes, is even more extraordinary than what we're talking about here. 524g, Your Honor, a situation where Congress specifically allowed these sorts of releases. If these constitutional concerns are real, then 524g is unconstitutional, and this court, frankly, is going to take a wrecking ball to the bankruptcy code, given the situations in which bankruptcy courts are allowed to dispose of, eliminate, defeat, stand in the way of property interests that you don't see outside of bankruptcy. There's no question about that. And I think with respect to a lot of these constitutional questions, they really ought to be dealt with on an as-applied basis. The only issue before this court is one of statutory authority. Counsel, can we talk a little bit about what is direct and what's derivative? Sure. In some ways, neither side has satisfied me in answering that. I always thought that any release in bankruptcy would stop suits for derivative claims, correct? Fraudulent compliance claims are derivative claims that belong, those claims belong to Purdue, and those can be settled by Purdue, correct? So that's right, Your Honor, insofar as what the law does is take those away from the third parties, their property interests, just like the claims, the direct claims, and the state takes them over and can settle them. And I take it from the government's brief that the settlement can include an extinguishment of all derivative claims. I haven't understood why the personal injury claims are not derivative claims also, because generally these pills were sold by the corporation, not by the individuals. And so I'm a little lost as to why the personal injury claims are considered derivative. I'm sorry, are considered direct. I do understand that there are some consumer laws, state consumer laws, that could be viewed as direct claims. But I'm sort of, help me out. So, Your Honor, I think one of the reasons why it's confusing is because any direct claims that are subject to the releases here are functionally indistinguishable from the derivative claims. For this reason, the releases, as carefully narrowed by the bankruptcy court, only apply to claims that are dependent on Purdue's own conduct. But that's not a definition in my mind. So the definition, Your Honor, is that derivative claims apply to conduct that's generalized as to everyone. Any creditor could assert that claim. So the claim that the Sacklers were involved with Purdue in mismarketing OxyContin or selling it to the wrong people, those are generalized claims. The exception would be if you had a claim that one of the Sacklers, some of whom are doctors, sold OxyContin out of their dorm room. That would be a particularized claim to that consumer. That would be a direct claim. But the claims here, and I think what's significant is the trustee. All you're arguing to me right now, because you're still not helping me with the definition, is that that issue has to be resolved below. And it would be resolved in future lawsuits as to whether or not the bankruptcy agreement extinguished that particular type of derivative. Well, I think that's important insofar as no one has ever really identified the direct claim that's dependent on Purdue's conduct that would be released here. I mean, there were consumer protection claims. All of the states now are no longer opposing this settlement. So I think you're right insofar as in some sense what we're talking about here is really sort of hypothetical, and a particularly bad reason to destroy this entire settlement is that they agree that all of the derivative claims can be released. And what we're talking about is the extent to which the release applies to direct claims that the trustee hasn't actually identified. But I think the more important point is that the trustee's position is that any release, no matter the circumstances, is not allowed if it's not consensual. Can we talk about your position, though, on that? Sure. I guess I'm trying to understand if it's your view that the Sacklers could condition their funding of this estate on anything that the code does not expressly prohibit. I would say no insofar as a bankruptcy court is going to look carefully at this, and there are many limitations. It has to be necessary to the reorganization. But you define necessary, as I understand it, as anything the Sacklers require. Oh, not at all. Not at all. So what does necessary mean in your view? Well, in this case, what the bankruptcy court found was that without the releases, without the settlement that came in, the company would liquidate and victims would receive money. Only because the Sacklers wouldn't give the money back, right, under those circumstances. They are conditioning their willingness to fund this estate on the releases. That's correct, Your Honor. So it's only necessary insofar as they are requiring it. That was an inquiry that the bankruptcy court took. I mean, what he looked at is all the circumstances, including all the arguments about the Sacklers, and it looked at what was right to maximize the estate here, and whether this release was necessary for the reorganization to avoid liquidation. So if you take one of the hypotheticals in the U.S. trustee's brief about the painting, if the Sacklers has insisted on the reallocation of a painting or something like that, there's no way a bankruptcy court would approve that release. I guess I don't understand why. Why isn't – since the lynchpin fact here, as you've just articulated it, is the Sacklers' willingness to put money into the estate, why can't they – and that it's necessary insofar as the Sacklers are demanding it in this situation. Why can't they demand anything and let that be necessary? I don't understand why there's a difference as to it being necessary in a different way. Right. Of course, in theory, they could demand anything, Your Honor, but you have a bankruptcy court that has to make that determination. You have an Article I court that has to make that determination. You have over 30 years of experience, courts applying a very carefully set of factors that limit the availability of these releases. In this case, they were necessary because of the direct threat to the race posed by these parallel exact same claims that would be presented by the – against Purdue that would be brought against Sackler and trigger indemnification contribution and insurance right as well as inundate the company through litigation. They – the bankruptcy court considered that without this funding, the victims – the company would have to liquidate. There is a $2 billion super-priority loan, and I hope the government's response gave you as much discomfort as I did. The fact is, is that that priority exists and the possibility of negotiation should give this court a good sense that the bankruptcy court was right that we will have a liquidation with no one recovering anything. Thank you, Counselor. Justice Thomason? Justice Neal? Justice Sotomayor? Justice Kagan? Justice Gorsuch? Justice Kavanaugh? A couple questions. On the statutory point of the term appropriate, which to me is key, in isolation, that's a broad term and really helps you. But as the Chief Justice said in his first question, we, in interpreting statutes like that, that assign broad authority to usually regulatory agencies here at the bankruptcy court, we've been cautious, especially in recent years, about reading those to give too much authority. Major questions, doctrine, elephants and mouse holes. And I'm curious why, in this case, that those principles, which go way back in this court's jurisprudence, as I see it, wouldn't apply here and say, yeah, appropriate's a broad term, but we should read it narrowly because that would be a question of great economic significance that we won't assume Congress slightly assigned. Sure. So the major questions, doctrines, premise on separation of powers, principles that apply to delegations, executive agencies, this is a provision that applies to the courts, the Article III courts in exercise, delegating authority by the bankruptcy courts. Appropriate is a term of classic breadth that essentially gives the courts a common law role that, while broad, is part and parcel of what bankruptcy courts and equity courts have been doing for centuries in this context. And I think that also answers why this isn't really a major questions problem. This court has never applied the major questions doctrine to a catch-all provision that stands alone and has its own limitations. Keep going. And not give an effect to that provision. How about just elephants and mouse holes? We've used that more generally. Right. So 1123b6 is not a mouse hole, Your Honor. It's written in broad terms purposely given the history here, which was we want the courts to have all the power they can to resolve this bankruptcy. And with respect, it's not an elephant, particularly not when you consider the fact that everyone agrees that the derivative claims, including intentional fraud claims, can be taken from third parties, commandeered by the estate, and settled. It's consistent with what courts have been doing in joining suits between third parties for decades. This court in Celotex recognized that. It's consistent with equity practice. Justice Gorsuch said it was one case, but we've cited a case they've cited nothing. The Callaway case is completely inapposite. The sale at issue in that case was not necessary to the reorganization, which makes this case completely different. It was under a prior version of the code. This code has much more authority. On standing, I take your point, and this is somewhat of a side point, but I want to get it out. The U.S. trustee doesn't have standing, in your view, and I think that's a strong argument. But Ellen Isaacs would have standing. So do we need to get into the U.S. trustee's standing, given that Ellen Isaacs would have standing? So we don't think that she would, Your Honor, because she hasn't identified the direct claim that's dependent on Perdue's conduct that would be released that she could or would bring. So we don't think that she actually has established standing, notwithstanding that she, like many other victims, has suffered tragic circumstances. But I think the real problem, the other problem, is that what you're left with is the U.S. trustee who comes in here as an interloper with absolutely no financial stake in this resolution has lack standing, and what you're doing is relying on standing of parties who have forfeited any challenge to the question presented, which would be a very odd thing for this Court to do to decide on this issue of great public importance, particularly to the families and individuals involved. Thank you. Justice Barrett? Just one question, Mr. Garr. So if 1123B6 is as broad as you say, did Congress need to enact 524G to give bankruptcy courts special authority to handle these problems in the asbestos context? Yes. Is that just clarifying, or was it necessary? It was necessary because what Congress did is it acted against the backdrop of courts allowing these sorts of releases, and it recognized that. And then it says we need to have a further reticulated set of rules for asbestos, particularly because of the unique problem presented there with respect to future claimants. And so it enacted that special set of rules, and then it said in a separate act of Congress, hey, don't infer from this special scheme that the authority didn't already exist. And I think that that one-two punch makes it all the more important for this Court not to take that away from Congress. If Congress wants to establish a more reticulated set of rules for this, it can, but this Court shouldn't say, as Congress didn't in 1994, that the authority doesn't exist at all, given the plain text of 1123B6. Justice Jackson? A variation on Justice Barrett's question. If B6 is as broad as you say it is, then what are B1 through 5 doing there? In other words, I mean, right before, we have a bunch of specific grants of authority, and if B6 means what you say, then why did Congress have to put those in? Oh, sure. I mean, you could ask that question about any catch-all provision, Your Honor. The point is Congress said, these are the things that we want to say you can do, but we want to be extra clear. We want to make clear the Court has all the power to do the things it needs to do as long as they're appropriate. And haven't we normally said in our jurisprudence with respect to statutory interpretation that a catch-all that ends after a list is sort of like in the same nature of the list? It can't be just a totally different, huge thing. I think you would look to the other provisions, but just to be clear, this isn't like the fishing example that Justice Scalia gave, rods, reels, and other equipment. These are all things that grant authority, and then you have this catch-all that does it as well. And I want to be clear, the other provisions of B work directly with B6 here. I mean, for example, B3A gives the estate the authority to settle the estate's own claims. The releases here were necessary to the settlement of those claims the bankruptcy court found at JA400, and same too for B5, which gives the authority of the bankruptcy estate to modify the rights of creditors. Okay, one final question. With respect to inconsistent in B6, what is your view of the work of inconsistent? I mean, can a plan provision that conflicts with the principles underlying the bankruptcy code be inconsistent, or is it your view that it has to be inconsistent with a particular provision? I think the text answers that, Your Honor. It says inconsistent with applicable provisions, so you have to read all that together, and I think when you contrast that with appropriate, you can't read inconsistent with such breadth that it swallows appropriate. The inconsistent is doing a separate thing. It's saying look to other provisions and identify an applicable provision that this conflicts with, and unlike RADLAX, law, and JEVIC, you cannot identify that provision. In fact, the only other provision of the code that specifically addresses third-party releases allows it while telling courts not to infer from that that the authority doesn't already exist. Thank you. Thank you, counsel. Mr. Shaw. Mr. Chief Justice, and may it please the Court, the U.S. trustee does not speak for the victims of the opioid crisis. Quite the opposite. The trustee appointed the official committee, my client, as the fiduciary representing their interests. Every one of the creditor constituencies in this case comprising individual victims and public entities harmed by Purdue overwhelmingly supports the plan. Indeed, it was the creditors that insisted on the release of the creditor claims against the Sacklers for the same injuries to avoid a value-destroying victim-against-victim race to the courthouse that would result in no recovery for virtually all except the United States. That unrebutted finding, grounded in a massive record built on years of creditor-victim-led efforts, refutes the trustee's 11th-hour speculation of some magic alternative permitting an equitable victim recovery. That is why the fact finder relied on Section 1123b6's broad terms to approve the tailored release as essential to restructuring the debtor-creditor relationship in this case on which lives literally depend. I welcome the Court's questions. Mr. Shaw, what would be the difference between if the Sacklers had gone through bankruptcy and discharged this, or reached an agreement? How would it look different from the release? Well, Your Honor, I guess it's a hypothetical on multiple levels, because one, it's not clear that the Sacklers are eligible for bankruptcy. But if they did do that, there are a lot of questions that would need to be answered, including you would have dozens of different bankruptcies, and you would have a free-for-all in competition of reconciling those assets. It would take years, probably decades, if you talk to bankruptcy lawyers, for a victim to see assent from that hypothetical bankruptcy. And I think this is important. The focus under the Code, the principles of the Code, isn't on a hypothetical Sackler bankruptcy. Even the trustee says the Sacklers, as non-debtors, aren't even part of the Code. The focus should be on the victims, the creditors. The trustee tries to make this case about the Sacklers. It is about the victims. All mass tort third-party releases over the last 35 years, the Code has been in force for 45 years, over the last 35 years, all of those have involved wrongdoers, whether it's contraceptive devices, breast implants, or abuse. But the point is that bankruptcy is not to serve justice in some abstract sense. It's to maximize the estate for fair and equitable... Mr. Gannon... Let's assume that the Sacklers actually filed for bankruptcy. What would it look like? It's unclear what it would look like, Your Honor, Justice Thomson. I'm not trying to be difficult, but they're not even individuals, a lot of these. These are trusts. They can't file for bankruptcy. If you took an individual Sackler that did, the question is, what are their eligible bankruptcy-eligible assets? As Mr. Garr said, the bankruptcy-eligible assets are about $1 billion of the Sacklers. That's far less than the $6 billion that's put on the table. And then there would be a question of how to distribute those assets when the estimated value of claims here is $40 trillion. Here you have basically the 3% we're talking about of the individual claimants. What if you have a situation where the 97% is a particular type of claimant, individual claimants, but the 3% that is holding out are different claims altogether, commercial claims. Could the individuals in the bankruptcy court force the commercial claims into the bankruptcy settlement? Right. So, Your Honor, if the release tried to get rid of everything, but you had any class that didn't have a supermajority, that would almost certainly fail the Second Circuit's own test, which isn't challenged here, because you need a supermajority of the creditors. And as the cases that we have over the last 35 years, it's going to have to be of every class. Here, we have a supermajority of every class. In terms of what you say in the practice, but under the code, is there something that requires it to be a supermajority of every class? Only to this extent, Your Honor. The code says appropriate or inconsistent with any applicable provision. Courts for 35 years have given content to appropriate. One of the factors that virtually all of the courts have pointed to is supermajority approval of the creditors. Remember, the only people giving up claims here are the same creditors of the center. I'm sorry to interrupt you, but in one sense, you do have different classes. You have a class that recognizes the need to have recovery on an individual victim basis. But then you have a class that prefers to see the claims go forward, the money isn't enough, or however you want to phrase it. They have different interests. Yet you have a supermajority of the one class. Your Honor, here, the bankruptcy is divided into various classes. There is a personal injury victim class. Over 96% of that class voted to approve the plan. Currently, there is only one objector standing with the trustee in this case. So if in a hypothetical case there was not a supermajority, that would fail under the appropriate factors that courts have done for 35 years. Supermajority of each class? Of each class, yes, Your Honor. Again, the trustee hasn't challenged the stringent appropriate factors that courts of appeals have done. That's why you only have a handful of these in mass court bankruptcies. But they've been incredibly important. Dog and shield, contraceptives, breast implants, abuses. This is where the situation is there is no other alternative to get meaningful victim recovery. Mr. Gannon suggests that if we rule for him, it actually gives victims greater leverage in this kind of situation. Justice Kagan, thank you. If there's one thing you take away from my argument today, it is this. And let me be crystal clear. Without the release, the plan will unravel. Chapter 7 liquidation will follow. And there will be no viable path to any victim recovery. Well, that sounded very emphatic. Yes. But it's not just me being emphatic, Justice Kagan. I really want to know why. Because there's something to what Mr. Gannon says. You rule for him. Then you have another tool in your toolbox when the people that you represent sit around the table with Purdue and the Sacklers. Here is why. And now I'm going to try to unpack the unrefuted and unrebutted findings of the district court. You can read what the district court or the bankruptcy court said about it. It said JA352, JA365, JA404, 405. The trustee did not object to any of those findings. That's at footnote 54 of the district court opinion. This is the first time the trustee is objecting to those findings. So let me unpack why. I think it's time well spent. Why the district bankruptcy court made those unrebutted findings that there is no other, forget a better deal, there is no other deal. Here's why. Point number one, without the release, the Sacklers would not settle the estate claims, Purdue's most valuable assets. That's because of a classic collective action problem. The Sacklers would face a tsunami of direct creditor claims outside bankruptcy without the release. Just the cost of litigating those creditor claims would foreclose any reasonable settlement because they would be reserving for litigation of those. That's point one. Point two, without a settlement, the U.S. would gobble up the $1.8 billion in the estate right now with its $2 billion super priority claim. There would be zero dollars to victims out of the estate. Justice Barrett, you asked about that $2 billion super priority claim, and Justice Gannon gave a lot of answers how it's contingent. Let me be very clear, and you can see this in the record. It is not contingent on anything. That $2 billion super priority claim is an order of the court. That is enforceable. It will gobble up the entire estate. There is no gray area about that. That leaves zero dollars to victims from the estate. So point number three, what does that leave? That leaves a liquidation trustee to litigate the estate claims, but he doesn't have any assets to litigate with, and he has to litigate that in competition with all those direct creditor claims that the release isn't preventing. So just to recap so far, we have no settlement. We have a Chapter 7 liquidation in which the U.S.'s $2 billion priority claim eats up all assets, zero dollars for victims. You have their estate claims being litigated by a Chapter 7 liquidation trustee who has no assets to litigate them against plaintiff's lawyers who are suing the Sacklers on all the credit direct claims. Point number four, if even one of those direct claims, creditor claims, gets to judgment, that could wipe out all of the collectible Sackler assets. These are claims. States hold these consumer protections. These are $10, $20, $30 billion claims. Could you please slow down a little bit? Yes. I get confused because I know you're making this very dramatic, but I read your brief, and your brief says, in your brief, you argue that all personal injury claims against the Sacklers are derivative of claims against Purdue. And so only a small subset of claims fall into the non-consensual third-party release of direct claims at issue in this case. That's your brief at 54. Sure. So you're telling me that most claims are derivative and that there's only a few direct claims. So if there's only a few direct claims, how is that going to lead this case? So, Your Honor, that's because the agreements to not bring all the direct claims are contingent on the release. No, no, no, no. This is a collective action. Tell me what direct claims exist. All of the ones by the states, Your Honor, the consumer protection. Yeah, but the states are all willing to settle with you. But, Your Honor, and this is absolutely critical, Justice Sotomayor, their agreement to settle is contingent on there being a release because without a release, any one of them can defect. If the plan doesn't have a built-in release, they are trying to... The other side is saying, whether we call it opt-in or opt-out, I'm still not sure why opt-out is not okay. But if all the states are saying consensually, we're going to agree. So we're not going to sue you. We're not states. You're telling me that the individual claims are mostly derivative. Your Honor, whether... Like personal injury and others. We're talking about a small subset, using your own words, of claims that are direct will survive. How is that going to be an inducement to the Sacklers to pull out of this? Because, Your Honor, the large majority of direct claims are only being consensually dropped on there being a release that binds everyone. As soon as, if this court were to accept the trustee's position... But who's left? I'm sorry, you still haven't answered me. Okay, I'm sorry. All the states are going to say, we won't sue you. No. All the states... That's where, if I could stop you respectfully, Justice Sotomayor, that's contingent on there being the release in this plan. Their settlement is black and white contingent on that. As soon as the release goes away, all their direct claims become alive. Thank you, Counsel. Justice Thomas, anything further? Justice Alito? Justice Sotomayor? Justice Kagan? Justice Kavanaugh? What about individual suits against the Sacklers that could happen if you lose this case? There's a liquidation, so you get nothing from the estate.  Individual suits against the Sacklers, why is that not an available path? I know you hit on this, but I want you to finish that. Yeah, so I think this is critically important. Whatever is available from the Sacklers, whether that's $3 billion, $5 billion, $6 billion, $10 billion, there are about $40 trillion in estimated claims. As soon as one plaintiff is successful, that wipes out the recovery for every other victim. That is why the victims insisted on this release. As soon as one plaintiff is successful, they get the recovery. Every other victim gets exactly $0. That is the most fundamental point, I think, to understand. That is why 97% of the victims agreed to this nonconsensual release. They have no love lost for the Sacklers. There is no body of victims, no one, who would more like to have retribution against the Sacklers. DOJ obviously can prosecute them. It hasn't. But the point is, they can only get life-saving abatement and recovery dollars if there is a release. Because otherwise, the one plaintiff that jumps the line, hits the jackpot first, wipes it out for everyone else. That's about as simple as I can say it. What about the abatement programs? Can you talk about those briefly? Yes. The vast majority of the $6 billion that the Sacklers have contributed, and the $1.8 billion that is in the Purdue estate, $7 plus billion, the vast majority of that is going to go to abatement. 50 state AGs signed on to this plan, and the victims signed on to the plan, because of the multiplying effect of abatement. It will fund abatement, save lives, addiction, prevention. All of those things are contingent on the release and the money that's going to come through here. As soon as the release goes away, for all of the reasons that I said, and perhaps I was dramatic, but if you want an undramatic reading, read the bankruptcy court's unrebutted findings of the pages that I gave you. It lays out exactly what I did. I was trying to give it some color. But that is what's going to happen. And I say that jokingly, but it's not only legally improper for the trustee to do that, because it didn't object to any of those bankruptcy findings, and the district court points out it didn't object to those. It's not only legally improper, but it's irresponsible for the trustee now to suggest that there's some secret path to recovery for the victims. It just isn't. It's basic economics. It's collective action. The creditors spent three years doing, as the bankruptcy called, the most massive investigation of the Sacklers that it's ever seen in any case. Fifty state AGs, the official committee, every other victim and creditor group came together exploring every possible avenue and said that conjecture is false. There is no opportunity for a better deal. You can ask Mr. Gannon on rebuttal to point where is the evidence in the record that shows there is a better deal to be had. It does not exist. Every piece of evidence, every factual finding contradicts it. Basic economics, collective action contradict it. It just doesn't exist. They are going to get zero dollars. What explains, in your view, then the United States' position, given that it's not like them to read the word appropriate narrowly? Right, Your Honor. Well, we've been asking ourselves that question. Look, if they may have a legal objection to third-party releases, that's fine. I think if you read 1123b-6, if textualism matters, it says it has two limitations. It has to be appropriate. It can't be inconsistent with applicable provisions of the code. It doesn't say inconsistent with some hypothetical bankruptcy. It doesn't say inconsistent with general principles of the code. It could have said that. In fact, chapter 12 and 13 do say that. If you look at page 21 of the Roy Englert brief, chapter 12 and 13 has broader provisions. Congress chose specific words here, and those words are inconsistent with an applicable provision. They haven't pointed to any applicable specific provision that the third-party release here conflicts with because it doesn't. Instead, they go right to general principles of bankruptcy, this basic tradeoff of a debtor committing all its assets in exchange for a discharge. We don't have an automatic discharge here. We have a highly negotiated, tailored release that the victims need to get compensation that is safeguarded by all the appropriateness factors that judges in a common-law fashion have done. Thank you. Justice Barrett? Justice Jackson? My one nagging concern about your emphatic presentation is I'm thinking about those circuits that do not permit third-party nonconsensual releases. Right. And I think if I agree with you or if I believe your forecast about what's supposed to happen or what might happen in this situation, that there would never be a settlement of mass tort cases arising in those circuits, and the government has given several examples here of situations in which once there's a rejection of a bankruptcy effort to take care of this, parties settle in tort. So how do you explain that, if you're right, about what's likely to happen in this situation? Sure. Two things, Justice Jackson. One, it's not my forecast. It's a bankruptcy's forecast. But let me answer your question directly. The only example I heard today was the PG&E example out of the Ninth Circuit. That had a far, far, far smaller body of claimants. If you look at the actual mass, true mass tort bankruptcies where you have nothing near the funds available, like here, we have $1.8 billion in the estate and we have $40 trillion of claims, those Dalkin Shield breast implants, those are only possible with third-party releases. The other example they give, Justice Jackson, is the Arrow bankruptcy. That is not an insolvent, or not a bankruptcy. It was outside of bankruptcy. That is not an insolvent entity. But nor are the Sacklers. I mean, this is the problem that we're creating here, that we have half of it inside the bankruptcy. That's Purdue. And we have half of it outside the bankruptcy. That's the Sacklers. And what's troubling me is the sort of shifting between those two as we think about what's going to happen. You say in a suit against the Sacklers, if this gets blown up and people are suing the Sacklers, as soon as one victim gets money, then it's wiped out for everybody else. But I don't understand why that's so, because the Sacklers would not be in bankruptcy unless they file for bankruptcy at that point. Is that where your hypothetical is going? They have at least $11 billion or something. And so why would it be, unless a particular claimant gets that amount of money, there wouldn't be anything left for anyone else in suits against them? Right. So just to give you an example, if any one of the state claims succeeded, and I think if you look at the bankruptcy opinion, I think most people would agree the strongest direct claims by the creditors probably held by the states, right? Those are multibillion-dollar claims. If one of those states were to win, any collectible assets, and the $11 billion figure is their total assets, and it includes things that are held in overseas spendthrift trusts. But are we looking at what is collectible or not through the lens of bankruptcy? And they're not in bankruptcy, so I don't understand how we know. No, I'm not looking at it through the lens of bankruptcy. And I'll give you this, Justice Jackson. Let's assume all $11 billion, contrary to all fact in the years of investigation, let's assume all $11 billion is somehow collectible. By the way, that's false, JA 62932, whatever. Let's assume all $11 billion of it is collectible. Any one of those state claims would gobble it all up. Zero dollars to victims if they were successful. It's just black and white. And your point is that they wouldn't settle. The Sacklers are not going to settle if this is blown up. Without the release, the reason they can't settle is because there would be dozens, hundreds, the bankruptcy court posits thousands of these claims because they were only, this goes to Justice Sotomayor's question, everyone agreed not to bring them in consent only on the condition that nobody could bring them. And you're saying that same kind of agreement can't be made outside of the bankruptcy court. That's my only point here. Exactly. We all got together and we agreed in the context of bankruptcy, why couldn't that same kind of agreement occur if there is no bankruptcy vis-a-vis the claims against the Sacklers? And that's the critical question. And the reason is the linchpin of that agreement, the consent from all 50 states and all the rest, the 97% that agreed was that others couldn't jump ahead of the line and recover the third-party release. You can't get the third-party release outside of bankruptcy, which is why, for 35 years, courts have been doing it in mass court bankruptcies like Dalkinshield, like breast implants, like the abuse cases, in order to make it happen. Otherwise, you cannot get meaningful victim recovery. Thank you. Thank you, Counsel. Rebuttal, Mr. Gannon? Thank you, Mr. Chief Justice. If I could just make four points. First, Ms. Isaacs, Justice Kavanaugh, has been objecting to this release since the bankruptcy court, and she filed claims, to quote from her question presented, on behalf of herself and her deceased son, whom she found dead from an overdose on her bathroom floor. All of her claims have been released. We think that there is no doubt that she has standing here, and this idea that she has to specify the connection with this release is something that we haven't heard from the other side before. Second, Justice Sotomayor, that's not a derivative claim. That's a direct claim. The difference between a derivative claim and a direct claim is whether it's a claim that is being recovered on behalf of the corporation as a whole. And so that's why the fraudulent conveyance claims, if anyone brought an individual fraudulent conveyance action against the Sacklers here, those all become property of the estate because the benefit of bringing that asset back into the estate goes to the entire corporation. So Purdue takes over those claims. Purdue doesn't take over personal injury claims. Those are not brought on behalf of the corporation. If somebody gets a money judgment or some sort of relief for their individual claim, that's not something that accrues to every other creditor for the corporation. And separately, I'd also say you mentioned the consumer protection claims, which is what the Second Circuit said in footnote 15 are, at a bare minimum, the non-derivative claims here. There are individuals who also have state law consumer protection claims, and so those aren't all included in the settlements with the 50 states. And third, my friend says that there's going to be this victim-to-victim, victim-against-victim race in the courthouse, which involves assets that are not in the bankruptcy. But the solution to that is not to say that everybody gets zero dollars in that race. The court can't just do whatever it takes to make this deal possible. The court can't say, well, if they could do that, Justice Kavanaugh, then the court could say, you know, what would be more appropriate? Maybe more money, money that would be helpful to this deal. And as we've said, we don't think that the court can just say, you know, the Sacklers, we think it would be better if you put in $15 billion here if it's not money that is otherwise part of the estate. And so finally, you know, we support an abatement-centric plan here, and we have a disagreement about whether there's a potential deal on the other side of the reversal by this court. My friend on the other side says the bankruptcy court made findings about this, that this was the best possible deal, that this release had to happen for that particular deal. That was a $4.2 billion deal. That finding was immediately falsified after the district court's opinion here. And with respect to the $2 billion, that $2 billion judgment that we have is part of a non-final plea that has not been finalized because we're waiting for the end of the plan to be confirmed here. When it was accepted as part of a settlement before the bankruptcy court, it was contingent upon both the finalization of the criminal judgment and the confirmation of the plan. And so we think it's speculative to say that the $2 billion claim is going to eat up the entire estate. So, you know, we do hope that there's another deal at the end of this because this is something that needs to be worked out, but it doesn't necessarily have to be a deal with non-consensual releases. It doesn't have to be one bankruptcy. And we think the court should say that the dealing should not proceed on the premise that non-consensual releases are permissible under the bankruptcy code. We urge the court to reverse the judgment of the Court of Appeals. Thank you, counsel. Counsel. The case is submitted.